**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
─────────────────────────────────────────

**NEW YORK STATE ELECTRIC & GAS CORPORATION,**

                                            **Plaintiff,**

          **v.**                                      **5:13-CV-976**
                                                      **(TJM/ATB)**

**CENTURY INDEMNITY COMPANY, and**
**ONEBEACON AMERICA INSURANCE COMPANY,**

                                            **Defendants.**
─────────────────────────────────────────

**Thomas J. McAvoy, S.U.S.D.J.**

**DECISION & ORDER**

Before the Court are the parties' motions for summary judgment in this case

concerning insurance coverage for environmental cleanup at a number of Manufactured

Gas Plant ("MGP") sites in upstate New York.  See dkt,. #s 119, 126, 155, 158.[1]  The

parties have briefed the issues fully and provided voluminous documentation, and the

Court has determined to decide the matter without oral argument.

**I.      BACKGROUND**

This case grows out of the operation of certain power facilities by Plaintiff New

York State Electric & Gas Corporation ("NYSEG") and its predecessors in various towns

in upstate New York.  See NEW YORK STATE'S APPROACH TO THE REMEDIATION OF

FORMER MANUFACTURED GAS PLANT SITES, Exh. 5 to Declaration of David E. Elkind

───────────────────────

[1]As will become clear from the Court's decision in this matter, the Court will
decline to address Plaintiff's second motion for summary judgment, dkt. # 155, and
Defendant OneBeacon's motion for summary judgment, dkt # 158.  Those motions are
moot, as the Court's decision here disposes of the case.

("Elkind Dec."), dkt. # 119-1.  According to the New York State Department of Environmental Conservation ("DEC"), MGPs have long been present in New York State, beginning with an 1826 demonstration plant in New York City that produced gas from whale oil.  Id. at 1.  While the first gas produced supplied mostly street lights, by the 1880s and 1890s, utilities had discovered how to manufacture gas that could be use for lighting, heating, and cooking.  Id.  Such plants required a great deal of water to operate, and most of them were located along a body of water.  Id.  The gas made in these facilities was stored in tanks and distributed by pipes throughout towns and cities. Id.

DEC reports that MGPs were in widespread use throughout New York by the end of the 19th century; most towns larger than 5,000 people had one or more plants.  Id. Today, as many as 300 former MGP sites may exist across New York.  Id.  The development of pipelines to deliver natural gas across state lines eventually drove MGPs out of business.  Id. at 2.  Most such plants had closed by the 1950s, and the last MGP plant in the State shut down in 1972.  Id.

The gas manufacturing process created waste that the DEC and other state and federal agencies began to address in the 1970s.  Id.  The waste was a result of the gas manufacturing processes used in the plants.  Id.  Those plants used two main methods. Id.  The first process the plants used was coal carbonization; plants heated coal in closed retorts or beehive ovens.  Id. at 2.  This burning caused "volatile constituents of the coal" to become a gas.  Id.  The plants collected, cooled, and purified the gas, which was then piped to customers for use.  Id.  After the Civil War, a new process emerged: carburetted water gas.  Id.  While there were a variety of methods to create

gas this way, all of them heated coke or coal in the presence of steam.  Id.  Such heating created a flammable gas mixture of methane and carbon monoxide, which was then sprayed with petroleum products to create more methane.  Id. at 2-3.  These processes produced a gas mixture that burned hotter and brighter than the gas produced by carbonization.  Id. at 2.  By 1900, most MGPs in New York used the carburetted water gas process.  Id.

These processes created waste which is often still present at MGP sites.  Id. The most common byproduct of the processes is "coal tar," a "dense, oily liquid."  Id. at 3.  Coal tar "condensed out of the gas at various stages during its production, purification and distribution."  Id.  Utilities sometimes collected the coal tar for sale or reuse, but much of the waste remained at the MGP sites.  Id.  Such wastes often leaked from storage or processing facilities.  Id.  Manufacturers also often discharged the waste into nearby lakes and rivers.  Id.  These wastes contaminated the soil, groundwater, and sediments that surrounded the MGPs, and such contamination remains at many such sites today.  Id.  Coal tar produced by carbonization was more viscous than coal tar produced form gas carbuerration and manufacturers found less value in its recovery.  Id.  As a result, most of the waste that remains at sites today is "water gas tar" from that process, and is "actually derived from liquid petroleum products, not coal."  Id.  Being more liquid that true coal tar, the waste is more likely to contaminate groundwater.

Both processes caused waste that concerned regulators, however.  The tar wastes include chemicals from a family known as "polycyclic aromatic hydrocarbons" ("PAHs").  Id.  Such compounds do not easily dissolve in water, and are usually found

3

near the tar itself.  Id.  Tars also have BTEX in them, a "family of volatile organic compounds" made up of benzene, toluene, ethylbenzene and xylene.  Id.  These compounds, more soluble than PAHs, often contaminate the groundwater near MGPs. Id.  According to DEC, "[t]ars often contain enough benzene to meet the legal definition of hazardous waste."  Id.

Other waste also emerged from gas manufacturing.  Id. at 3-4.  Such waste, called "'purifier waste'" or "'box waste,'" usually consisted of mixed wood chips, iron filings and clumps of solidified tar.  Such waste is solid, and does not move through the subsurface like liquid tar might.  Id.  That waste, however, can contaminate groundwater and gives off a strong, offensive odor if exposed at ground level.  Id. at 4. Today, MGP wastes are rarely found on the surface, largely because most exposure took place 5-20 feet below grade, and also because of redevelopment at sites that covered the surface.  Id. at 6.  Some sites contain exposed waste, and some migration to the surface has occurred.  Id.

Since the 1970s, state and federal agencies have identified former MGP sites as potential sources of hazardous waste.  Agencies like the Environmental Protection Agency (EPA) and the DEC have worked with utilities who own the sites, like the Plaintiff, in an effort to remediate them by removing and containing the waste.  The evidence produced in this case demonstrates that NYSEG has made considerable efforts to investigate and remediate former MGP sites since the 1970s.  NYSEG developed a program and spent millions of dollars in this effort, sometimes on its own initiative and sometimes at the behest of the agencies.  Eventually, NYSEG sought coverage from its insurers for the cost of these efforts.  This case grew out of the

response to the insurance claims by the Defendant insurers, Century Indemnity Company ("Century") and OneBeacon American Insurance Company ("OneBeacon"). Both companies reserved and then disclaimed coverage on various grounds, including lack of notice pursuant to the policy terms and lack of coverage under the policy.

Plaintiff filed a Complaint in this matter on August 14, 2013. See dkt. # 1. The Complaint alleges that Plaintiff "has conducted, or will conduct, investigations and cleanup activities at the MGP Sites pursuant to both" state law and the oversight directives of the DEC. Id. at ¶ 12. Moreover, Plaintiff alleges that it has "incurred costs to mitigate its damages by pursuing another third party for contribution to the investigation and cleanup of MGP Sites." Id. The Complaint contains two claims. The first seeks a declaratory judgment that the Defendants are obliged to reimburse Plaintiff for defense costs and liability for the MPG sites. Plaintiff "seeks a judicial determination by this Court of the obligation of Defendants to indemnify NYSEG with regard to defense costs and liability arising form the MGP Sites [sic]." Id. at ¶ 23. Count Two alleges breach of contract. Plaintiff avers that Defendants breached their contracts by refusing "to indemnify NYSEG for, or pay any of, NYSEG's defense costs in connection with the investigations of environmental property damages associated with the MGP Sites [sic][.]" Id. at ¶ 25(a). Plaintiff also contends that Defendants breached the parties' contracts by "fail[ing] and/or refus[ing] to indemnify NYSEG for, or pay any of, NYSEG's liability in connection with the cleanup of environmental property damage associated with the MGP Sites [sic]." Id. at ¶ 25(b). Plaintiff seeks money damages on that claim.

After the parties completed discovery, Plaintiff filed a motion for summary

judgment solely on the issue of whether NYSEG's notice to insurers was timely.  <u>See</u> dkt. # 119.  Defendants responded in opposition to that claim, and at the same time moved for summary judgment on the issues of notice and the statute of limitations. <u>See</u> dkt. # 126.  Before the Court could rule on these motions, Plaintiff filed another motion for summary judgment, this time contending that the Court should find that the pollution at MGP sites was an "accident or occurrence" under the applicable policies, and that the Defendants were therefore obligated to provide coverage for the cleanup costs.  <u>See</u> dkt. # 155.  Finally, Defendant OneBeacon, filed a motion for summary judgment seeking a declaratory judgment from the Court that the OneBeacon policy in question did not provide coverage under the circumstances.  <u>See</u> dkt. # 158.  As the Court is persuaded that the issue of notice and the statute-of-limitations resolves all the questions in this case, the Court will address only the motions that address these two issues.

## II.    LEGAL STANDARD

### A.    Summary Judgment

The parties here move for summary judgment.  It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, <u>see</u> <u>Tenenbaum v. Williams</u>, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party.  <u>Anderson v. Liberty Lobby</u>, 477

U.S. 242, 248 (1986).

A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

**B.    Contract Interpretation**

The matter here involves coverage under an insurance policy, which is a contract.  In New York, "'the cardinal principal for the construction and interpretation of insurance contracts–as with all contracts–is that the intentions of the parties should control.'" World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co., 345 F.3d 154, 184 (2d Cir. 2003) (quoting Newmont Mines Ltd. v. Hanover Ins. Co., 784 F.2d 127, 135 (2d Cir. 1986)).  Unless the parties state otherwise, "'words should be given the meanings ordinarily ascribed to them and absurd results should be avoided.'" Id.  Language in insurance policies "should be examined in light of the business purposes sought to be

achieved by the parties and the plain meaning of the words chosen by them to effect those purposes." Id. (internal quotations omitted).  The language used in the contract generally controls, unless ambiguity exists in that language.  Id.  Ambiguity exists when "a contract term 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" Id. (quoting Morgan Stanley Group Inc. v. New England Ins. Co., 225 F.3d 270, 275 (2d Cir. 2000)).

## III.    ANALYSIS

This case involves insurance coverage for six former MGP sites, which the parties have identified in the following ways: Plattsburgh-Saranac Street, Auburn Clark Street, Cortland/Homer, Ithaca Court Street, Norwich, and Oneonta.

### A.    The Insurance Policies

There are a number of insurance policies involved in this case.  First, Century Indemnity issued NYSEG an excess insurance liability policy, no. XPL 3587, covering the period 10/1/51 to 10/1/64.  Plaintiff's Statement of Material Facts in Support of Its Motion for Summary Judgment ("Plaintiff's Statement"), dkt. # 120, at ¶ 1.[2]  The parties agree that this policy had coverage after a $20,000 self-insured retention, but they disagree as to the total amount of coverage available.  Id. at ¶ 2; Defendants' Joint

_____

[2]The parties all submitted the statements of material fact with citations to the record required by the local rules in reference to their motions. The Court will cite to the statement filed in connection with the motion being considered for relevant statements that are uncontested.  Where statements are contested or other statements of material fact contain relevant information not cited in the Plaintiff's original statement, the Court will cite to other sources and explain any disagreement.

Response to Plaintiff's Statement of Material Facts ("Defendants' Response"), dkt. #

162-2 at ¶ 2.  Plaintiff contends that the policy limits varied during the period from

$500,000 to $1.5 million per occurrence or accident.  Plaintiff's Statement at ¶ 2.

Defendants argue that the limits on these policies varied from $500,000 to $2.01 million

per occurrence or accident.  Defendants' Statement at ¶ 2.

That policy provided coverage for property damage caused by an "accident."

Plaintiff's Statement at ¶ 3.  Later, that coverage applied to an "occurrence."

Defendants' Statement at ¶ 3.  On May 17, 1957, the policy was amended to replace

the term "accident" with "occurrence."  Plaintiff's Statement at ¶ 4.  The policy defined

an "occurrence" as:

> either an accident or a continuous and repeated exposure to conditions
> which result during the policy period in injury to or destruction of property,
> including the loss of use thereof, which is accidentally caused.  All
> damages arising out of such exposure to substantially the same general
> conditions shall be considered as arising out of one occurrence.

Id.

The policy also contained a notice provision, which Plaintiff contends in relevant

part provided that:

> Upon the happening of an occurrence or accident that appears
> reasonably likely to involve liability on the part of the company written
> notice shall be given by or on behalf of the insured to the company or any
> of its authorized agents as soon as practicable . . . If thereafter suit or
> other proceeding is instituted against the insured to enforce such claim
> the insured shall, when requested by the company, forward to the
> company every demand, notice, summons or other process or true copies
> therefore.

Id. at ¶ 5.  Defendants add other portions of the notice requirement they deem relevant.

Defendants' Response at ¶ 5.  They note that the policy also requires that "[s]uch notice

9

shall contain particulars sufficient to identify the insured and also the fullest information available at the time.  The insured shall give like notice, with full particulars, of any claim made on account of such occurrence or accident."  Id.

Defendant OneBeacon's predecessor in interest, Employer's Liability Assurance Corporation ("ELAC"), sold Plaintiff an excess insurance policy, no. E16-9091-004 for the period 10/1/64 to 10/1/70.  Plaintiff's Statement at ¶ 6.  The policy was for $2.01 million above a $20,000 self-insured retention.  Id. at ¶ 7.  Defendants add that the policy provides coverage for an "occurrence," defining such an event as:

> The word "occurrence" as it applies to Property Damage Liability, other than Automobile Damage Liability, shall mean either an event or a continuous or repeated exposure of conditions which result during the policy period in the injury to or destruction of property including the Loss of use of thereof which is accidentally caused.  All damages arising out of such exposure to substantially the same General Conditions shall be considered as arising out of one occurrence.

Defendants' Response at ¶ 7.  The policy also states that, "except as herein provided" the terms and conditions of ELAC's primary policy apply to the excess policy here at issue.  Plaintiff's Statement at ¶ 8.  The parties disagree about whether the terms of the primary policy defining an occurrence apply, or whether the terms in the excess policy do.  See Plaintiff's Statement at ¶ 9; Defendants' Response at ¶ 9.  The difference between the primary policy and the excess policy is that the primary policy does not contain a qualifier requiring that any injury must occur "during the policy period."  Id. Coverage for property damage under the primary policy is limited to only certain specified sites, while the excess policy lacks those limitations.  Plaintiff's Statement at ¶ 10.  The Plaintiff and One Beacon disagree about whether those differences apply to all property coverage or to third-party property damages.  Compare Plaintiff's Statement at

10

¶ 10 with Defendants' Response at ¶ 10.

Plaintiff insists that OneBeacon asserts that the excess policy in question

incorporates the notice provision from the primary policy, which provides:

> Notice of Accident.  When an accident occurs written notice shall be given
> by or on behalf of the insured to the company or any of its authorized
> agents as soon as is practicable . . . Notice of Claim or Suit.  If claim is
> made or suit is brought against the insured, the insured shall immediately
> forward the company every demand, notice summons or other process
> received by him or his representative.

Plaintiff's Statement at ¶ 11.  OneBeacon responds that the provision that applies is

from the excess policy, which provides:

> **Notice of Occurrence**.  When an occurrence occurs written notice shall
> be given by or on behalf of the insured to the company or any of its
> authorized agents as soon as practicable.  Such notice shall contain
> particulars sufficient to identify the insured and also reasonably obtainable
> information respecting the time, place and circumstances of the
> occurrence, the names and address of the insured and the available
> witnesses.
>
> **Notice of Claim or Suit**.  If claim or suit is brought against the insured,
> the insured shall immediately forward to the company every demand,
> notice, summons or other process received by him or his representative.

Defendants' Response at ¶ 11.

These policy requirements provide the background for the elements material to

this action and the bases of the parties' arguments, as the Court will explain below.

## B.    Waiver of Notice Requirements

Anticipating that the Defendants will argue that Plaintiff breached the notice

requirements in the policies, Plaintiff first contends that summary judgment is

appropriate for NYSEG on this issue because, in communicating with Plaintiff after

Plaintiff provided notice, Defendants did not properly raise the notice issue, and have

therefore waived it.  Plaintiff's opening brief contends only that Defendant OneBeacon waived notice, but in reply to Defendants' response, Plaintiff also asserts that Defendant Century Indemnity also waived that coverage defense.

In New York "[w]aiver may be found 'where there is direct or circumstantial proof that the insurer intended to abandon the defense.'" New York v. Amro Realty Corp., 936 F.2d 1420, 1431 (2d Cir. 1991) (quoting Albert J. Schiff Associates, Inc. v. Flack, 51 N.Y.2d 692, 698, 435 N.Y.S.2d 972, 975 (1980)).   Thus, the key question here is "if, under common-law principles, triable issues of fact exist whether defendants clearly manifested an intent to abandon their late-notice defense."  KeySpan Gas E. Corp. v. Munich Reins. Am., Inc., 23 N.Y.3d 583, 591, 15 N.E.3d 1194, 1198 (N.Y. 2014)). [3] New York insurance law holds that "waiver of rights under a contract 'should not be lightly presumed.'" Globecon Group, LLC v. Hartford Fire Ins. Co., 434 F.3d 165, 176 (2d Cir. 2006) (quoting Gilbert Frank Corp. v. Fed. Ins. Co., 70 N.Y.2d 966, 520 N.E.2d

---

[3]Plaintiff attempts to argue that a higher standard for waiver applies than the common-law standard stated here.  New York Insurance Law § 3420(d)(2) provides that "If under a liability policy issued or delivered in this state, an insurer shall disclaim liability or deny coverage for death or bodily injury arising out of a motor vehicle accident or any other type of accident occurring within this state, it shall give written notice as soon as is reasonably possible of such disclaimer of liability or denial of coverage to the insured and the injured person or any other claimant."  NY Ins. Law § 3420(d)(2).  "Compared to traditional common-law waiver and estoppel defenses, section 3420(d)(2) creates a heightened standard for disclaimer that 'depends merely on the passage of time rather than on the insurer's manifested intention to release a right as in waiver, or on prejudice to the insured as in estoppel.'" KeySpan, 23 N.Y.3d at 590 (quoting Allstate Ins. Co. v. Gross, 27 N.Y.2d 263, 267 (1970)).   That heightened standard does not apply to this case, however, since the statute "applies only in a particular context: insurance cases involving death and bodily injury claims arising out of a New York accident and brought under a New York liability policy."  Id. No such claims are made here, and the Court will apply the traditional common-law standard.

512, 514 (N.Y. 1988)).  A party asserting waiver "must put forward evidence of a 'clear manifestation of intent' to waive by the other party."  Id. (quoting Gilbert Frank, 520 N.E.2d at 514).  Wavier comes when the "waiving party . . . '[lulls] [the other party] into sleeping on its rights under the insurance contract.'"  Id. (quoting Gilbert Frank, 520 N.E.2d at 214).  If a party has "repeatedly and expressly reserved its rights in its communications with" the insured, those "reservations preclude arguments both as to waiver and as to equitable estoppel."  Id.

The parties agree that Plaintiff gave notice of the MGP sites in November, 1991. Plaintiff's Statement at ¶ 42.  The letters Plaintiff wrote the insurers included an attachment that set out the current status of the dozens of sites where contamination allegedly occurred, including the sites at issue in this litigation.  Id.  OneBeacon also points out that it received notice about the Plattsburgh-Saranac Street site on July 30, 1991.  Defendants' Response at ¶ 42.  The letter mailed to the Defendants on November 12, 1991, stated that "NYSEG has undertaken an investigation and cleanup effort for former Manufactured Gas Plant Sites in New York State where certain byproduct wastes were generated."  See Exh. 32 to Elkind Dec.  The utility further related that "Project Summary Reports have been developed for each site.  Required remedial and/or cleanup costs wil be incurred pursuant to applicable" standards.  Id. NYSEG also sent Century a letter on June 1, 1992 that notified Defendant "that NYSEG has identified damage in the form of containment and cleanup costs associated with the Plattsburgh, New York former manufactured gas plant coal tar site" that required action for remediation and cleanup.  See Defendants' Corrected Statement of Material Facts in Support of their Motion for Summary Judgment ("Defendants' Statement"), dkt. #

13

133-1, at ¶ 422.

Each insurer responded to these notices.  The Court will address Century's responses first, and then address OneBeacon's interactions with NYSEG.  On November 25, 1991, Century wrote to acknowledge NYSEG's letter of November 12, 1991.  See Exh. 154 to Declaration of Robert F. Walsh ('Walsh Dec."), dkt. # 126-7.  The letter asked for copies of all policies which might apply to the damage and reminded Plaintiff that "this request for further information is not intended to, and does not, indicate any decision concerning coverage has been made by us."  Id.  Defendant might decide, after investigation, to disclaim coverage or entertain claims under a reservation of rights.  Id.  At the same time, however, "the fact that we are conducting this investigation of the underlying facts . . . should not be considered as a waiver by us of any of the rights that we may have when responding to these claims."  Id.  Century promised to inform Plaintiff in writing of the specific reasons for any coverage decision.  Id.  Century wrote NYSEG again on June 23, 1992.  See Exh. 169 to Walsh Dec.  In that letter, Defendant again asked for additional information and assistance in locating any applicable policies.  Id.  Defendant informed NYSEG that it "expressly reserves any and all of its rights whcih it may have under any alleged policy."  Id.  The effort to locate policies "shall not prejudice" Defendant from "asserting any and all defenses under the alleged policies."  Id.

On July 20, 1992, Defendant wrote NYSEG to disclaim coverage on several policies on various grounds.  See Exh. 177 to Walsh Dec.  This letter addressed all of the sites at issue in this case.  Id.  See Exh. A to letter.  As to the policies at issue, Defendant still sought copies of the particular policies.  Exh. 177 to Walsh Dec.  The

letter warned, however, that "the policies may give rise to coverage issues, including, but not limited to," a number of issues.  Id.  Those issues included whether the policies actually provided coverage for the injuries claimed, whether certain exclusions in the policy prevented coverage, and "whether late notice bars coverage."  Id.  The letter informed Plaintiff that "[f]or these reasons, as well as any others which might exist under these or any other policies, we will continue to conduct our policy search and investigation pursuant to a full and complete reservation of rights[.]"  Id.  This letter applied to all of the potential MGP sites for which Plaintiff provided notice.  Id.

The parties addressed the Plattsburgh site directly.  On July 17, 1992, NYSEG wrote Century to inform the insurer that NYSEG planned "to file individual claims on each site when the total effort at each site has progressed to the point where claim costs have been adequately defined."  See Exh. 175 to Walsh Dec.  According to correspondence from Defendant to NYSEG on May 11, 1993, NYSEG had informed Defendant on May 7, 1993 that the company intended "to file an actual claim only" with reference to the Plattsburgh site at that time.  See Exh. 182 to Walsh Dec.  As to the other sites, NYSEG had informed Century that the "prior correspondence" about those sites "constitutes notice of a potential claim only, and that" the utility would "provide [Century] with written notice if and when you choose to file an actual claim on said sites."  Id.

Defendant Century wrote to NYSEG on November 24, 1993 about the Plattsburgh site.  See Exh. 193 to Walsh Dec.  The letter noted that an applicable policy had been discovered, but asked for additional policies if available that covered the site. After discussing the history of the Plattsburgh site, the evidence of pollution, and the

investigations surrounding that site, the letter discussed coverage issues based on the language in the recently unearthed policy.  Id.  Noting that the activities which caused the damage may not have been accidental in nature, Defendant "reserve[d] our rights to disclaim coverage based upon the absence of 'property damage liability' as this term is used in the policy."  Id.  The letter also contended that the policy covered damage that occurred in the policy period, which ran from 1951-1964, and that "MGP wastes were disposed on in the on-Site unlined lagoon from 1896 to 1960."  Id.  Thus, "there is a question as to whether any of the alleged damage to the property can be attributed to activities that took place during the policy period."  Id.  Defendant reserved its right to disclaim coverage on that basis as well.  Id.  Defendant also reserved because the policy language excluded coverage for damage to the insured's own property.  Id. Finally, citing the notice provision in the policy, Defendant stated:

> The information we have obtained indicates that NYSEG was aware by the late 1970s that MGP wastes had contaminated the soil and groundwater at the Site, and that they were conducting extensive remedial programs by the early 1980s in response to the same.  However [Defendant] was not provided with first notice of this matter until 1991. Therefore, there is a question as to whether notice of this claim was provided to [Defendant] in accordance with the above-cited policy provisions, and we reserve our rights to disclaim coverage under said provisions.

Id.  Defendant disclaimed coverage for the Plattsburgh site on this and other bases on April 22, 1994.  See Exh. 205 to Walsh Dec.

OneBeacon also responded to the notice provided by Plaintiff concerning MGP claims.  NYSEG wrote OneBeacon on July 30, 1991, explaining that "substantial expenses have been incurred to control coal tar contamination of the Saranac River and remediation of future damage" at the Plattsburgh site and asserting a claim under

16

the policy.  See Exh. 141 to Walsh Dec.  OneBeacon responded to the letter on August 5, 1991 by acknowledging that notice had been provided about the Plattsburgh site and requesting a copy of the policy in question.  See Exh. 143 to Walsh Dec.  A copy of the policy was necessary before OneBeacon could "determine the extent of our obligations, if any[.]"  Id.  The letter also informed Plaintiff that "[t]his communication is not intended nor should it be construed as an exhaustive recitation of all policy terms and conditions."  Id.  The letter further stated that "[n]othing herein shall be deemed as a waiver of any policy provision and" defendant "reserve[d] all rights and coverage defenses available under the applicable policy, including the right to assert positions at a later date."  Id.  On September 17, 1991, Defendant's counsel wrote NYSEG.  See Exh. 147 to Walsh Dec.  That letter disclaimed coverage for the Plattsburgh site.  Id. Defendant cited several reasons for disclaiming.  Id.  The pollution exclusion clause in the relevant policy applied, Defendant contended, as did the owned-property exclusion. Id.  Further, Defendant asserted, no occurrence and no property damage had occurred during the policy period.  Id.  The letter also stated that "[t]his disclaimer is based on presently available information.  Commercial Union reserves its right to supplement this letter at any time."  Id.  Defendant also averred that "[n]othing contained herein shall be considered a waiver, alteration or modification of any of the terms, conditions, exclusions or limitations" in the policy.  Id.

After OneBeacon received notice concerning the other sites on November 12, 1991, Defendant's counsel wrote NYSEG on February 12, 1992.  See Exh. 156 to Walsh Dec.  That letter referenced additional policies which Plaintiff contended covered

17

the environmental damage in question.[4]  Id.  The letter stated that the insurer had been

unable to find the policies in question and requested that Plaintiff forward any copies to

Defendant.  Id.  The letter also contained a "reservation of rights," which states that the

Defendant "reserves its rights under the terms, conditions, exclusions or limitations set

forth in the above-referenced alleged policies."  Id.  Defendant also warned that the

matter in question "may seek the imposition of liability which may exceed the applicable

limits of liability coverage available under" the policies.  Id.  The letter directed NYSEG

to "place all of its primary and excess carries which may be impacted by this matter on

notice" of the claim.  Id.  Finally, "[n]othing contained herein, including Commercial

Union's willingness to investigate this matter, shall be considered a waiver of any of the

terms, conditions, limitations and/or exclusions in the alleged policies."  Id.

On March 6, 1992, OneBeacon disclaimed coverage with reference to all MGP

sites for the policy that covered the period from October 1, 1970 to October 1, 1973,

and reserved its rights to any other policies not yet located.  See Exh. 158 to Walsh

Dec.  This letter discussed all of the sites at issue in this litigation except the

Plattsburgh site, for which Defendant had already disclaimed coverage.  Id.  Using

information provided by the Plaintiff, the letter discussed the investigation and

remediation work which had been performed at each site, as well as the dates when the

first inquiries from regulators occurred.  Id.  The letter also listed the policies in

question, noting that several had not yet been located and requesting that NSEG

_____

[4]The Court notes that this policy specifically references the Plattsburgh site, but
it also specifically references a number of policies which NYSEG asserts cover the sites
in question and for which Defendant had not yet made a determination.

forward any copies discovered.  Id.  The letter then listed the reasons for disclaimer

under the policy that had been found.  Id.  The Defendant disclaimed because of the

pollution exclusion, the lack of occurrences within the policy period, lack of damages

within the policy period, the owned property exclusion, an alienated property exclusion,

and because of "late notice."  Id.  The letter related that:

> Our review of the project summary reports indicate that NYSEG was not
> only aware of the existence of the MGP sites but also that these sites
> would require remedial and/or cleanup costs many years prior to
> NYSEG's November 12, 1991 letter to [Defendant].  These sites include:
> Owego, Cortland/Homer, Oneonta, Mechanicville/Central Avenue, Ithaca
> (Court Street), Penn Yan (Water Street), Elmira (Madison Avenue),
> Geneva/Border city, Warsaw, Ithaca/Cayuga Inlet, Ithaca (First Street),
> Palmyra, Dansville, Mechanicville-Coons Crossing, Auburn (Clark
> Street), Auburn (McMaster Street), Auburn (Green Street) and Lockport.
> Aoccordingly, to the extent that the notice of occurrence was not given to
> Commercial Union as soon as practicable under the language of the
> policy, coverage may not exist under the relevant policy.

Id.  The letter also noted that the "disclaimer is based upon presently available

information."  Defendant "reserve[d] the right to supplement this letter at any time."  Id.

Moreover, "[n]othing herein shall be considered a waiver, alteration or modification of

any of the terms, conditions, exclusions or limitations" in the policy.  Id.  The letter

contained two other similar reservations of rights, the second of which stated that

"[n]othing stated herein, including" Defendant's "willingness to investigate this matter,

shall be considered a waiver of any of the terms, conditions, limitations and/or

exclusions in the alleged policies."  Id.

A separate letter sent the same day to NYSEG requested copies of other policies

in question and restated that Defendant did not intend to waive any defenses and

"continue[d] to reserve all of its rights and defenses under any such policy."  See Exh.

19

159 to Walsh Dec. NYSEG responded by promising to continue to search for the missing policies and requested additional time to do so. See Exh. 160 to Walsh Dec. Defendant agreed to permit that extension in a letter dated April 14, 1992. See Exh. 163 to Walsh Dec. That letter reiterated that "[n]othing contained herein shall be considered a waiver of the terms, conditions, limitations or exclusions of any alleged" policy. Id.

Correspondence over the missing policies continued for much of the next two years. See Defendants' Statement at ¶ 469-499; Plaintiff's Response to Defendants' Statement of Undisputed Facts ("Plaintiff's Response"), dkt. # 138 at ¶ 469-499. Plaintiff wrote Defendant in June, 1992, that the policies in question applied for coverage, and that they could be identified by secondary evidence. Defendants' Statement at ¶ 470-471. Plaintiff sent an annual report on MGP sites on June 8, 1992, informing OneBeacon that NYSEG intended to seek coverage for each individual site at an appropriate time; OneBeacon responded that it could not locate the policies in question and requested secondary evidence. Id. at ¶¶ 473-474. OneBeacon reiterated its position that it could not respond to the request for coverage without reviewing the policies. Id. at ¶ 475. In a letter dated July 30, 1992, Defendant again reiterated its earlier disclaimers and reservations of rights with reference to the Plattsburgh site and the other MGP sites. See Exh. 179 to Walsh Dec. The letter reiterated that "[u]ntil tangible secondary evidence of the alleged polices is produced," Defendant "ha[d] no obligation" to participate in any settlement negotiations in reference to the sites. Id. Another letter, sent December 4, 1992, continued to seek policies and repeated the statement that Defendant did not "[intend] to waive any rights or obligations" and

20

"hereby continue[d] to reserve all of its rights and defenses under any such policy."  See

Exh. 181 to Walsh Dec.

On June 17, 1993, OneBeacon wrote NYSEG at the conclusion of its

investigation of the Plattsburgh site.  Defendants' Statement at ¶ 480.  The letter

supplemented Defendant's reasons for disclaiming coverage on the one policy in

Defendant's possession.  Id.  The letter added to the earlier identified notice issues by

stating:

> NYSEG was aware of coal tar seepage from its facility to the Saranac
> River at least by 1972.  NYSEG was aware of the toxicity of the coal tar
> substances to acquatic life by at least 1974.  In 1978, the Clinton County
> Department of Health advised NYSEG that seepage of coal tar into the
> Saranac River was in violation of public health laws and in 1981, the New
> York State Department of Environmental Conservation advised NYSEG
> that the seepage of coal tar was a violation of the Environmental
> Conservation Law.  NYSEG engaged in extensive investigation and took
> remedial actions during the 1970's [sic] and 1980's [sic].  It was not until
> July 30, 1991, however, that NYSEG purported to notify [Defendant] of the
> claims asserted in this matter.  As a result of over 17 years of delay in
> providing notice to [Defendant], [Defendant] is not obligated to provide any
> coverage whatsoever to NYSEG under [the] [Defendant's] policy [in
> question].

Exh. 183 to Walsh Dec.  The Defendant warned that the disclaimer was based on

information then available and requested any information that would alter OneBeacon's

view.  Id.  Defendant also "reserve[d] its right to supplement this disclaimer under the

terms, conditions, limitations and exclusions set forth in the . . . policies enumerated

herein if new or additional information becomes available."  Id.  The Defendant also

informed Plaintiff that no copies of additional policies had been located and that

Defendant was "closing its files and will no longer investigate this matter under the

Alleged Policies."  Id.  NYSEG wrote in response, noting that it had provided evidence

of claims and intended to file claims for individual sites when the costs of claims were adequately identified.  Defendants' Statement at ¶ 483.  OneBeacon repeated the basis for its disclaimers in a letter dated August 4, 1993.  Id. at ¶ 484.  OneBecon added that "[n]othing contained herein shall be considered a waiver or modification of the reasons for disclaimer and our reservation of rights set forth in our March 6, 1992 letter." Id. at ¶ 485.[5]  OneBeacon sent Plaitniff a similar letter on August 26, 1993.  Id. at ¶ 486.

Correspondence, meetings, and disputes continued about the existence of the policies through the rest of 1993.  Id. at ¶¶ 486-490.  The parties met, and NYSEG provided Defendant with secondary evidence of the policies.  Id. at ¶¶ 487-489.  OneBeacon was not satisfied with Plaintiff's evidence of the policies.  Id. at ¶ 490.  Defendant wrote on December 23, 1993 that "[t]he terms, conditions, exclusions, definitions and endorsements of all of the alleged policies remain unknown."  See Exh. 196 to Walsh Dec.  Because of that lack of information, Defendant denied coverage.  Id.  Defendant restated OneBeacon's position in a January 26, 1994 letter.  See Exh. 199 to Walsh Dec.  The company did not disclaim coverage under the policies, but it did "[continue] to reserve its rights as set forth under our previous Reservation of Rights letters and will not agree to participate in a defense or indemnification of NYSEG under

---

[5]  Plaintiff's disputes the Defendants' statement here, claiming "NYSEG does not dispute that Defendants' statement accurately quotes a portion of the referenced letter. However, Defendants' statement contains selective citations from the document they cite, omits meaningful portions of the document, and mischaracterizes what the full document says.  Additionally, NYSEG disputes the validity of OneBeacon's purported reservation of rights."  Plaintiff's Response at ¶ 485.  This response is boilerplate, and repeated throughout Plaintiff's Response.  Such a response is hardly helpful to the Court, as it does not identify they parts of the letter that are actually in dispute.  The Court has examined the letter itself and finds the quotation to be accurate.

the alleged policies." Id.  Defendant promised to continue its efforts to locate the policy

terms.  Id.

　　　In its January 26, 1994 letter, OneBeacon offered to settle the lost policy issue

with the Plaintiff, but for an amount much less than the value of the policy claims.

Defendants' Statement at ¶ 494.  Plaintiff claims to have responded to that letter, but

points to no evidence.  Plaintiff's Response at ¶ 495.  On March 15, 1994, Plaintiff sent

OneBeacon notice that NYSEG had "negotiated and is planning to sign an Order on

Consent" with the DEC.  Defendants' Statement at ¶ 495.  Ten days later, Plaintiff

executed the Order on Consent.  Id. at ¶ 496.  Plaintiff then wrote OneBeacon, stating

that "[w]e have requested both defense and indemnity coverage for [the MPG sites] in

accordance with the provisions of the policies and applicable law."  Id. at ¶ 497.  After

entering into this Consent Order, NYSEG continued to send monthly and yearly

progress reports on the MGP sites.  Id. at ¶ 498.  Defendant responded by reiterating its

requests for information and its disclaimers and reservations of rights.  Id. at ¶ 498.

The last such communication cited by the parties occurred on August 10, 1999.  See

Exh. 217 to Walsh Dec.  That letter to NYSEG from Defendant acknowledged the

progress reports, but noted that the reports "have not responded to our requests for

information, sent to you on January 12, 1994 and November 26, 1996."  Id.  Such

information was "necessary for us to review in order to make a coverage

determination."  Id.  The letter further incorporated the earlier reservation of rights and

inquiry letters, and noted that the letter did not represent any waiver of rights or

defenses; Defendant "reserve[d] all of its rights and defenses under the terms,

conditions, limitations, endorsements and/or exclusions" of the policies in question.  Id.

The parties agree that NYSEG next communicated with OneBeacon through the summons and Complaint filed in this action, on August 14, 2013. Defendants' Statement at ¶ 499.

This evidence establishes that Defendants never manifested an intent to abandon the waiver defense in any of their communications with the Plaintiff. As to Century, the evidence recited above makes clear that, after initially reserving all rights under the coverage, Century expressly disclaimed on several grounds, including notice. Century continued to reiterate these reservations and disclaimers in correspondence with Plaintiff in the intervening years. No jury could fail to conclude from this evidence that Century never expressed a clear intent to abandon the defense. While OneBeacon was slower to disclaim coverage fully, none of the evidence recited above would provide a juror with a basis to conclude that OneBeacon expressed a clear intent to abandon the defense. First, after receiving notice, OneBeacon clearly and expressly reserved all rights under the policy. When disclaiming on the specific policy that Plaintiff was able to supply OneBeacon clearly articulated notice as one of the bases for that disclaimer. At the same time, OneBeacon continued to provide Plaintiff with an opportunity to provide additional policies that covered the period in question, reserving all rights under those policies in the meantime. Even when declining to provide coverage because of a failure to produce the policy language in question, OneBeacon continued both to provide Plaintiff an opportunity to produce the policies and to reserve any rights after they were produced. Thus, to the extent that OneBeacon disclaimed under the produced policies, OneBeacon cited notice as one basis for denying coverage. No rational juror could find that OneBeacon ever manifested an intent to

24

abandon the defense.

Plaintiff asserts that Defendants have waived lack of notice as a defense by failing to specify that defense when they disclaimed coverage on other grounds.  A recitation of grounds without mention of notice can be evidence of abandonment, but an insurer does not always waive that defense by failing to state it.  See Commercial Union Insurance Co. v. International Flavors & Flagrances, Inc., 822 F.2d 267, 273-74 (2d Cir. 1987).  The common law makes clear that "[w]aiver of a defense is proven by evidence that the insurer intended to abandon that defense."  Id. at 274.  Plaintiff is correct that some courts have found that "'a repudiation of liability by an insurer on the ground that the loss is not covered by the policy operates as a waiver of the notice requirements contained in the policy.'"  Burt Rigid Box v. Traverers Prop. Cas. Corp., 302 F.3d 83, 96 (2d Cir. 2002) (quoting H.S. Equities, Inc. v. Hartford Accident & Indemn. Co., 661 F.2d 264, 270-71 (2d Cir. 1981)).  "Courts may find waiver where, for example, an insurance company disclaims coverage for failure to satisfy one condition precedent but neglects to assert other such conditions."  Id. at 95.  "By electing to disclaim on the merits" and failing to mention notice, an insurer "waive[s] the notice requirement of the policy."  Rock Transport Properties Corp. v. Hartford Fire Ins. Co., 433 F.2d 152, 153 (2d Cir. 1970); see also, Amro Realty, 936 F.3d at 1431 ("New York law establishes that an insurer is deemed, as a matter of law, to have intended to waive a defense to coverage where other defenses are asserted, and where the insurer possesses sufficient knowledge (actual or constructive) of the circumstances regarding the unasserted defense.").

Here, the insurers did not assert a number of defenses and then fail to reserve

25

any additional rights.  The evidence that disclaimer included notice for Century is abundantly clear.  OneBeacon, too, issued a disclaimer on the policy it had in its possession that included notice.  Even if OneBeacon denied coverage for failure to produce the policy terms on those policies which were missing, OneBeacon continued to maintain a reservation of rights on those missing policies.  OneBeacon can hardly be found to have abandoned a defense based on notice language in the policy when Plaintiff was unable to produce the policy language upon which such a defense would apply.  OneBeacon claimed it lacked sufficient knowledge to state all bases.  This is especially true because OneBeacon asserted notice grounds based on the policy language and facts for the one policy available; Plaintiff was surely aware that OneBeacon intended to raise this defense.  This is not a case, like <u>Burt Rigid</u>, where the insurer disclaimed coverage on specific grounds, failed to name any other grounds or offer any sort of general reservation, and then tried later to assert notice.  The reservations of rights offered by the Defendants were sufficient to preserve their notice defense, and the Plaintiff's motion will be denied in this respect.

### C.    Notice

Having resolved that question, the Court turns to the issue of whether Plaintiff provided notice as required by the policies recited above.  This failure to provide notice is the primary basis for the Defendants' motion for summary judgment.  They contend that Plaintiff knew that MGP sites were polluted for years before they notified their insurers, and that this practice failed to satisfy the provisions in the policy requiring notice of an injury "as soon as practicable."  Defendants also contend that Plaintiff failed to provide timely notice of claims raised against them by government agencies,

and that NYSEG therefore also violated the notice-of-claim provision in the policies. Plaintiff responds that notice was timely, as mere knowledge of potential contamination is insufficient to trigger the policies' notice provisions.  Moreover, NYSEG was unaware of whether regulators would actually impose any liability on them for the pollution, and thus no obligation to provide notice attached.

In New York, "an insured's failure to comply with a notice-of-occurrence provision is generally a complete defense even if the insurer was not prejudiced by the untimely notification."  Olin Corp. v. Insurance Co. of N. Am., 966 F.2d 718, 723 (2d Cir. 1992). "'Compliance with a notice-of-occurrence provision in an insurance policy is a condition precedent to an insurer's liability under the policy.'"  Id. (quoting Commercial Union Ins. Co. v. International Flavors & Fragrances, Inc., 822 F.2d 267, 271 (2d Cir. 1987)). Such provisions have an important function, as they "allow insurances companies to make an early investigation into the particular circumstances of an occurrence[,]" which can "aid . . . future litigation" and help to eliminate dangerous conditions that caused the accident.  Id.  Early notice also helps insurers set a proper reserve, determine premiums, and detect fraud.  Id.  Notice is required when "'the circumstances known to the insured at the time would have suggested to a reasonable person the possibility of a claim.'"  Id. (quoting Commercial Union, 822 F.2d 272).  A policy provision requiring notice "'as soon as practicable . . . requires that notice be given within a reasonable time under all the circumstances.'"  Id. (quoting Security Mut. Inc. Co. v. Acker-Fitzsimmons Corp., 31 N.Y.2d 436, 441, 340 N.Y.S.2d 902, 293 N.E.2d 76 (1972)).  "In some cases, even short delays will render a notice untimely."  Id.  "Under New York Law, delays of even one or two months are routinely held unreasonable."  Indian Harbor

27

Ins. Co. v. City of San Diego, 586 Fed. Appx. 726, 729 (2d Cir. 2014). "The burden is on the insured to show that a delay was reasonable under the circumstances." American Ins. Co. v. Fairchild Indus., 56 F.3d 435, 438 (2d Cir. 1995). "[N]otice requirements are to be liberally construed in favor of the insured[.]" Morris Park Contr. Corp. v. National Union Fire Ins. Co. of Pittsburgh, 33 A.D.3d 763, 764 (2d Dept. 2006).

The policies in question here were excess policies. If the notice involves an excess carrier, "the focus is on when the insured reasonably should have known that the claim against it would likely exhaust its primary insurance coverage and trigger its excess coverage, and whether any delay between acquiring that knowledge and giving notice to the excess carrier was reasonable under the circumstances." Morris Park Contr. Corp. v. National Union Fire Ins. Co. of Pittsburgh, 33 A.D.3d 763, 765 (2d Dept. 2006).

Two types of notice were required by the policies in question. The first required notice to be provided upon an "occurrence." Under a notice-of-occurrence provision, failure to provide such notice may be excused "by proof that the insured either lacked knowledge of the occurrence or had a reasonable belief of nonliability." Commercial Union, 822 F.2d at 272. A court may grant judgment based on failure to provide notice "when (1) the facts bearing on the delay in providing notice are not in dispute and (2) the insured has not offered a valid excuse for the delay." New York v. Blank, 27 F.3d 783, 795 (2d Cir. 1994).

Defendants also contend that Plaintiff violated the provisions in the policies requiring notice of claims raised against the insured. Courts in New York find that notice requirements in insurance policies that address claims are triggered before the

28

filing of a formal legal action.  "Giving the term its ordinary meaning, a claim is an assertion by a third party that in the opinion of that party the insured may be liable to it for damages within the risks covered by the policy."  American Ins. Co. v. Fairchild Indus., 56 F.3d 435, 439 (2d Cir. 1995).  Such notice "'must relate to an assertion of legally cognizable damage, and must be a type of demand that can be defended, settled and paid by the insurer.'"  Id. (quoting Evanston Ins. Co. v. GAB Business Servs., Inc., 521 N.Y.S.2d 692, 695, 132 A.D.2d 180, 185 (1st Dept. 1987)).  No "formal proceeding" is necessary to make a claim.  Id.  Moreover, a claim can exist even without "reason to believe that there actually is liability."  Id.  "[V]irtually any assertion of an exposure to liability within the risks covered by the insurance policy is a claim."  Id. Only when "the assertion is made in circumstances so unusual that they negate the possibility of a formal proceeding involving defense costs as well as liability," can assertion of liability fail to constitute a claim.  Id.  Indeed, a notice of claim provision can "be triggered by an unreasonable–even sanctionable–assertion of liability."  Id.  Thus, "[a]n assertion of possible liability, no matter how baseless, is . . .  all that is needed to trigger a notice of claim provision."  Id.

While notice is necessary to obtain coverage, "'an insured's good-faith belief in nonliability, when reasonable under the circumstances, may excuse a delay in notifying an insurer of an occurrence or potential claim' . . . The same holds true for a reasonably held belief of noncoverage."  Reynolds Metal Co. v. Aetna Cas. & Sur. Co., 259 A.D.2d 195, 199-200 (3d Dept. 1999) (quoting Marinello v. Dryden Mut. Ins. Co., 237 A.D.2d 795, 796 (3d Dept. 1997)).  "Whether a plaintiff's belief of nonliability and noncoverage under the relevant circumstances was reasonable is ordinarily a question of fact."  Id. at

200.  This standard applies whether the notice arises from an occurrence or a claim.

Id. at 201-202.  "[T]he insured bears the burden of establishing the reasonableness of

the proffered excuse" for failing to provide timely notice.  Great Canal Realty Corp. v.

Seneca Falls Ins. Co., Inc., 5 N.Y.3d 742, 744, 800 N.Y.S. 521, 521, 522 (2005).

Defendants here argue that Plaintiff failed to provide notice for any of the six

MGP sites in question.  Notice came in 1991, and Plaintiff had knowledge of both

occurrences and claims, Defendants insist, long before that notice.  Defendants divide

their arguments between the Plattsburgh site and the other five sites as the facts are

distinct between them.  The Court agrees that this is the most logical approach and will

address the facts related to notice in that way.[6]

### i.    Plattsburgh Site

The Plattsburgh MGP site produced gas between about 1892 and 1960.

---

[6]The Court notes that the parties have provided thousands of pages of
documents in connection with their motions.  These documents consist in large part of
reports of dozens of investigations performed by environmental consultants at the MGP
sites, internal NYSEG memoranda concerning investigation and remediation at the
sites, correspondence between NYSEG and regulatory agencies, and correspondence
between insurers and NYSEG.  The Court has carefully reviewed these submissions
but will cite largely to the parties' statements of material facts in addressing the motion
in this respect.  The Court makes the general observation, however, that the evidence
provided by the parties demonstrates that NYSEG was aware of potential
contamination at MGP sites in the 1970s, developed a program in the 1980s for
investigating the sites and negotiating with regulators that involved setting aside
considerable sums for which NYSEG now seeks reimbursement, and only gave notice
to the insurers in the 1990s, well after NYSEG had developed an approach for
attempting to deal with any potential liability at the sites.  The Court notes the findings
by Judge Forrest in Travelers Indem. Co. v. Northrop Grumman Corp., 3 F.Supp.3d 79,
97 (S.D.N.Y. 2014): "[t]he mere fact that submissions on summary judgment are
extensive (even requiring a moving truck) does not mean that there is a genuine issue
for trial.  Such extensive submissions may mean that the record is simply a large one.
The facts material to resolution of the motion may nonetheless be undisputed by
competent evidence."

Defendants' Statement at ¶ 143.  The parties disagree about the exact amount of coal-tar waste produced at the site, but agree that the amount could have been as much as 2,000,000 pounds.  Id. at ¶ 144; Plaintiff's Response at ¶ 144.  The operators of the MGP site placed the coal tar into two unlined lagoons.  Defendants' Statement at ¶ 145. The lagoons played an important role in the plant's operation.  Id. at ¶ 146.  This operation caused substantial contamination.  Id. at ¶ 148.  The Plattsburgh site contained spent oxide wastes such as wood chips containing cyanide, which were found in the subsurface soil.  Id. at ¶ 149.  When the plant closed, the lagoons were filled in, but material contaminated with tar remained in the bottom of the lagoon.  Id. at ¶ 150.

A NYSEG environmental manager who visited the Plattsburgh site in the 1970s reported that he saw tar "bubbling up out of the ground and into the river."  Id. at ¶ 153.[7] He saw a "mess" that would be difficult to clean up.  Id. at ¶ 154.[8]  An internal NYSEG memo dated May 14, 1980 found that coal tar in the Saranac River (which adjoined the MGP site) was first documented in the early 1970s but speculated that contamination

---

[7]Plaintiff "disputes" this statement, citing generally to the entire deposition of Peter G. Carney, the environmental manager entire.  Plaintiff's Response at ¶ 153.  The "dispute" does not point to any particular language that undermines this statement. Indeed, when asked during his deposition about a "preliminary look" he took at the Plattsburgh site, he reported that he would "tell NYSEG that they had a mess on their hands."  See Exh. 226 to Walsh Dec.  At both Plattsburgh and another location, an observer could see "visible indications of tar, iron, [and] ferroferric cyandie."  Id.  When he visited the site in the early 1970s he saw tar globules in the Saranac River.  Id.

[8]Plaintiff agrees that quotations to the testimony are accurate, but argues that "Defendants' statement contains selective citations from the document they cite, omits meaningful portions of the document, and mischaracterizes what the full document says."  Plaintiff's Response at ¶ 124.  Plaintiff offers no citations to the record to explain these misuses of the testimony.

likely occurred far earlier.  Id. at ¶ 155.  NYSEG's investigation of the site came in part

from complaints about visible tar deposits by people fishing on the River.  Id. at ¶ 156.

Plaintiff does not dispute that by January 20, 1975, NYSEG was aware of the possibility

that it may have violated as many as five state and federal laws at the site: (1) the

Federal Water Pollution Control Act; (2) the Rivers and Harbors Act of 1899; (3) the

New York Fish and Wildlife Law, (4) the New York Water Pollution Control Law; and (5)

the New York Navigation Law.  Id. at ¶ 157.  In September 1978, after hearing of

complaints from anglers, a DEC biologist visited the Saranac River and saw an oil-like

substance that emerged from the river sediments while wading.  Id. at ¶ 158.  The

biologist noted that the "toxicity of fuel oil, tar and other similar substances to fish is well

documented."  Id. at ¶ 158.  A NYSEG consultant's report from October 1975 found

"acute toxicity" for fish because of coal tar seeping into the River from the lagoon.  Id. at

¶ 159.  A NYSEG environmental engineer made similar findings in October 1974.  Id. at

¶ 160.  The Clinton County, New York, Department of Health warned of the dangers to

fish from waste entering the Saranac River in November 1978.  Id. at ¶ 161.  The

Department warned that "discharge of the material into the Saranac River" would be a

"direct violation of Section 1300(b) of the Public Health Law" and informed NYSEG that

"all reasonable actions should be taken to remove the material presently in the river and

to prevent further seepage in subsequent years."  Id.

Plaintiff disputes these statements regarding knowledge of contamination only

generally, while also contending that NYSEG did not know, "at the time, that any

contamination resulted from the operations area."  Plaintiff's Response at ¶¶ 157-161.

Nevertheless, Plaintiff admits that on March 28, 1979 NYSEG approved spending

$100,000 to investigate and hire consultants regarding the Plattsburgh site. Defendants' Statement at ¶ 163.  This expenditure came from "increased pressure from government agencies and environmentalists to stop the seepage of coal tar" from NYSEG's property "into the Saranac River[.]" Id.  Plaintiff, in acknowledging this document, "disputes that it knew, at that time, that any contamination resulted from the operations area."  Plaintiff's Response at ¶ 163.   Plaintiff does not dispute that the DEC and the New York State Department of Health ("DOH") had "insisted that NYSEG determine 'the extent of the coal tar presence and what methods might be taken to stop the damage.'"  Defendants' Statement at ¶ 164.

Over the next two years, the investigation contemplated by this approved expenditure occurred, as well as continued contacts with regulators concerning the property.  See Defendants' Statement at ¶¶ 164-177.  A report commissioned by NYSEG and issued by Acres American in December 1979 found that "coal tar has migrated over most of the site area as well as into areas north and northeast of the site."  Id. at ¶ 167.  The report also warned that "the current situation is in violation of several regulations."  Id. at ¶ 169.  An internal NYSEG memo issued at the same time warned that "coal tar may be considered a hazardous waste," and also warned that "the New York State Public Health law prohibits allowing coal tar to enter a water body," and violating other state regulations.  Id.  DEC wrote NYSEG on July 22, 1980, warning that "coal tar contamination of the Saranac River is a violation of" section 17-0501 of the State Environmental Conservation Law, regardless of whether it violates the Federal Superfund Statute, and that DEC could "require NYSEG to 'carry out any instream borings and/or sampling which will contribute to the definition of the extent of coal tar

migration under the river and the magnitude of the quantities of the pollutants involved."
Id. at ¶ 170.  By August 1, 1980, NYSEG had concluded in an internal memo that the
company had "'very little choice about whether'" to accede to DEC's demands, and that
"'if the coal tar is found offsite [NYSEG] might be required to spend several millions of
dollars for containment measures.'" Id. at ¶ 171.  In a May 12, 1981 discussion of the
Plattsburgh issue, NYSEG noted that both DEC and DOH had concluded that NYSEG
would be required to spend to clean up the River in any remediation project.  Id. at ¶¶
172-173.

DEC wrote to NYSEG on May 18, 1981, stating that "'[t]he discharge of coal tar
into the Saranac River is a violation of the Environmental Conservation Law,'" that DEC
had concluded that "'permanent containment system'" had to "'be constructed on the
property to prevent'" further coal-tar contamination, that coal-tar in the Saranac River
bed had to removed, and that "'Due to the complexity and scope of this project and the
nature of the violations, the Department must enter into a formal agreement with
NYSE&G for the containment/clean up project.'"  Id. at ¶ 174.  DEC provided a draft
Consent Order for NYSEG to sign on May 18, 1981.  Id. at ¶ 175.  NYSEG lawyers
noted that the draft order required NYSEG to both stop discharging into the River and to
clean up contaminated portions of the River.  Id. at ¶ 176.  They also found that the coal
tar seepage violated Section 17-0501 of the Environmental Conservation Law, which
could leave NYSEG liable for potential prosecution and fine of more than $1 million.  Id.
The lawyers concluded that NYSEG had no choice but to clean up the River, as DEC
had "'indicated that they are not wiling to negotiate on that matter.'"  Id.  The lawyers
estimated that the recommended remedy would cost $1.28 million.  NYSEG executed

the Consent Order on June 26, 1981 without seeking the consent of either insurer.  Id. at ¶ 177.  The work pursuant to this order ended in 1982.  Id. at ¶ 178.  NYSEG spent more than $2 million to complete that work.  Id. at ¶ 179.

That remediation was not entirely successful, and NYSEG and regulators worked during the 1980s to contain contamination from the Plattsburgh site and to finalize the status of the site.  See Id. at ¶¶ 180-188.  Continued leakage led NYSEG to begin negotiating another Consent Order with DEC by September 17, 1984.  Id. at ¶ 181. NYSEG executed a Second Consent Order regarding the site on September 25, 1985. Id. at ¶ 182.  NYSEG neither notified nor sought the consent of either insurer.  Id. at ¶ 182.  Still, DEC continued to express concerns about the site.  Id. at ¶ 183.  On January 13, 1987, DEC notified NYSEG that the Plattsburgh Site had been placed on a Registry of Inactive Hazardous Waste Sites (the "Registry") as a "Class 4" site, which signified that the site had been properly closed but required continued management.  Id. at ¶ 184.  On April 12, 1988, NYSEG objected to this classification, claiming that coal-tar was non-hazardous.  Id. at ¶ 185.  NYSEG petitioned to have the site de-listed.  Id.  The DEC rejected this request on July 13, 1988 and instead named the Plattsburgh site as a "Class 2" site because DEC contended the site had not been properly remediated and still posed a significant environmental threat.  Id. at ¶ 186.  DEC granted a second de-listing petition on July 11, 1989, finding that the earlier consent order was sufficient to permit DEC to correct any deficiencies at the site.  Id. at ¶ 188.  Plaintiff points out that the DEC found that "'[s]ince no hazardous waste disposal has been documented, and the original administrative consent order was executed pursuant to ECL Article 17, it is my determination that at this time the Plattsburgh Coal Gasification Site . . . be

delisted[.]"  Plaintiff's Response at ¶ 188.

Plaintiff has attempted to raise a factual issue as to the sources of pollution and waste at the Plattsburgh site.  Plaintiff contends that waste at the site came from two sources: the lagoons and the actual gas manufacturing plant, and that such pollution should be considered a separate occurrence.  The parties dispute whether Carney testified that he first visit noticed coal tar bubbling from both the lagoon area and the plant area during his early visit to the site.  Compare Defendants' Statement at ¶ 189, Plaintiff's Response at ¶ 189.  Plaintiff points out that he could not specifically recall that he saw coal tar bubbling from the plant area.  See Carney Dep., Exh. 256 to Walsh Dec. at 25.  When asked if he saw "the bubbling of tar on the–in the area of the former MGP site," Carney responded that "I didn't differentiate between the specifics of where the lagoon was or where the actual site was.  Probably didn't know it at the time.  To me, those were, you know, all one operation."  Id.  Defendants point out that some testing in the late 1980s found coal tar contamination and other gasification waste around the vicinity of the former gas plant.  Defendants' Statement at ¶¶ 190-203.  Plaintiff disputes these findings in part, arguing that knowledge of contamination specifically related to the gas plant was equivocal and uncertain.  Plaintiff's Response at ¶¶ 190-203.  In any case, the Plattsburgh site was included as one of the 33 MGP sites that were to be investigated and remediated under NYSEG's March 30, 1994 Order on Consent with the DEC.  Id. at ¶ 204.  Remedial activities have since been conducted at the site.  Defendants' Statement at ¶ 204.

The Court finds that the evidence here can lead to only one conclusion: that the Plaintiff did not provide notice as required by the policy.  In its briefing, the Plaintiff

appears to have abandoned any argument that it provided timely notice on claims regarding contamination from the lagoons from which NYSEG and regulators had discovered waste seeped into the Saranac River in the 1970s. Plaintiff could not prevail on any such argument. The issue here is when notice was required. Courts in New York have found that "[w]hile the duty to provide notice does not begin on the basis of mere speculation, rumor, or remote contingencies far removed from the particular policy in question," notice is required "when an insured complying with its duty to use due dilligence in investigating potential claims against it would believe from the information available that its policy would be involved[.]" Christiania General Ins. Corp. of New York v. Great American Ins. Co., 979 F.2d 268, 275-76 (2d Cir. 1992). If the policy in question requires notice if it "'appears likely' that a claim will or 'may' involve a policy," notice is necessary when there "is a 'reasonable probability' of such happening, based on an objective assessment of the information available. Id. at 276. That reasonable possibility exists "even though there are some factors that tend to suggest the opposite." Id.

"Clauses in insurance contracts requiring 'prompt notice,' notice 'as soon as practicable,' or 'immediate notice' are generally construed to require notice within a reasonable time after the duty to give notice has arisen." Id. at 275. When the duty begins "requires an objective evaluation of the facts known to the insured." Id. This standard "is one of reasonableness." Id. The insured is not required to provide notice "on the basis of mere speculation, rumor, or remote contingencies far removed from the particular policy in question," and "when an insured complying with its duty to use due dilligence in investigating potential claims against it would believe from the information

available that its policy would be involved, the notice obligation arises." Id.
The notice requirement may be excused if the insured has "a good-faith belief of
nonliability" but such "belief must be reasonable under all the circumstances, and it may
be relevant on the issue of reasonableness, whether and to what extent, the insured
has inquired into the circumstances of the accident or occurrence." Security Mut. Ins.
Co., 31 N.Y. 2d at 441; see also, Illinois Nalt. Ins. Co. v. Zurich Am. Ins. Co., 107
A.D.3d 608, 609, 969 N.Y.S.2d 11 (1st Dept. 2013) (three-month delay in reporting
excusable because insured "needed to investigate the claim in order to determine the
basic facts, such as where the claim occurred, the nature of the injury, and the insurer
responsible for covering the claim.").

The evidence described above indicates that NYSEG was first aware of
complaints about pollution seeping from the Plattsburgh site into the Saranac River in
the early 1970s.  NYSEG environmental personnel noted tar-like substances in the river
and other waste on the property.  State and local regulators contacted the Plaintiff in
the 1970s, citing statutes and regulations that could lead to liability.  NYSEG itself
determined that the potential for liability necessitated an expenditure of $100,000 to
investigate the situation.  As explained above, NYSEG seeks coverage not just for
cleanup costs, but for the costs of investigation.  No reasonable juror could come to any
conclusion but that NYSEG knew that there was reasonable probability that the excess
policy would be implicated by this activity, and that notice was required years before
NYSEG provided that notice in 1991.

NYSEG was also required by its policies to provide notice of a claim upon "an
assertion by a third party that in the opinion of that party the insured may be liable to it

for damages within the risks covered by the policy." <u>Fairchild Indus.</u>, 56 F.3d at 439. Such notice "'must relate to an assertion of legally cognizable damage, and must be a type of demand that can be defended, settled and paid by the insurer.'" <u>Id.</u> (quoting <u>Evanston Ins. Co.</u>, 521 N.Y.S.2d at 695. Here, as explained above, there were assertions throughout the 1970s that NYSEG could be liable for violating various State laws and regulations, a potential liability acknowledged by NYSEG's lawyers. NYSEG did not provide the insurers with notice of these claims, however. Instead, NYSEG signed two Consent Orders that obligated Plaintiff to engage in extensive investigation and remediation. NYSEG eventually spent $2 million fulfilling its obligations under one such order. NYSEG admits it did not provide notice of that claim to the insurer before signing the Order. NYSEG thus failed to provide notice as required by the policy, and the motion must be granted in this respect.

Plaintiff's argument that notice was timely at least with respect to the former manufactured gas plant is unpersuasive. Plaintiff contends that the former plant was a source of waste independent from the lagoons, and thus subject to a different notice requirement. Plaintiff points to New York cases that apply an "unfortunate event" test to argue that the two events were separate and thus had a different notice requirement. That test applies to determine "whether a set of circumstances amounts to one accident or occurrence, or multiple accidents or occurrences, for purposes of resolving how much coverage is available under a third-party liability insurance policy." <u>Appalachian Ins. Co. v. General Elec. Co.</u>, 8 N.Y.3d 162, 170, 863 N.E.2d 994 (2007). Determining whether an event is a single occurrence requires consideration of: "whether there is a close temporal and spatial relationship between the incidents giving rise to injury or

39

loss, and whether the incidents can be viewed as part of the same causal continuum, without intervening agents or factors." Id. at 171-172. Here, Plaintiff seeks coverage for environmental damages caused by coal-tar leaks from the operation of a manufactured gas plant in Plattsburgh, New York. Plaintiff contends that there was more than one occurrence because the coal tar that contaminated the site came from the lagoons and from the former plant site. NYSEG had no responsibility to provide notice on leakage from the former plant until that leakage was discovered, Plaintiff claims.

The Court is unpersuaded by that argument. Here, there was certainly a close temporal and spacial relationship between the plant and the lagoons. The waste that is the subject of regulation and remediation is of the same type, whether in the lagoon or near the plant. Regulators and investigators could not easily separate the specific source of contamination, particularly the contamination that leached into the Saranac River. The common process of manufacturing gas produced coal tar as a primary waste, and separating whether the waste for which remediation was required came from the plant or the lagoons would likely be impossible. This case is not like Com. Edison v. Employers Ins. of Wasau, 1997 WL 727486, at *2 (S.D.N.Y. Nov. 21, 1997), where the Court was able to apply the unfortunate event test to determine that contamination caused by handling toxic substances at two sites two miles apart constituted separate events. Neither is the case like Argonaut Ins. Co. v. Travelers Ins. Co., 6 Misc. 3d 1006(A), 800 NYS2d 342 (Table), 2005 WL 66778, at *2 (N.Y. Sup. Ct. Jan. 5, 2005), where the Court found separate occurrences because "the damages which arose from environmental problems at . . . [insured's] approximately 140 sites

40

throughout the United States cannot properly be aggregated into one occurrence because the damages arising at each site resulted from exposure to the particular conditions existing at that site, and not from some 'general conditions' that were 'substantially the same at all of the different sites.'" (internal citations omitted).[9]  The Court will grant the motion in this respect.

### ii.    Other Sites

Defendants argue that Plaintiff also failed to provide timely notice with reference to the other five sites.  NYSEG had knowledge of DEC claims related to the MGP sites by 1986, and did not provide notice for five years.  Moreover, Defendants contend, NYSEG's program for investigating the sites and reporting to DEC in the 1980s demonstrates that NYSEG knew of occurrences which required notice.  Plaintiff's position is that no claim by the DEC occurred before NYSEG and DEC signed a Consent Order in 1994 covering the sites in question, and that NYSEG had no duty to provide notice of occurrences until the utility knew that any obligation regarding a site exceeded the $20,000 self-insured retentions in the policies.

Defendant points to an internal NYSEG memorandum issued on November 10, 1986.  See Exh. 59 to Walsh Dec.  That document provides an extensive discussion of NYSEG's involvement with MGP sites and interaction with regulators about them.  Id. The document describes a five-step process NYSEG intended to follow at each former

---

[9]Moreover, as Defendant points out, Plaintiff did not provide any separate notice for the Plattsburgh former gas plant site, and thus would lose on that count even if the Court found separate occurrences.  Moreover, the 1981 consent order, for which Plaintiff admit it did not provide notice, covered the Plattsburgh site and was not confined to the lagoons.

MGP site.  Id.  "Task 1" involved the collection of "historic data" about the site, which would allow NYSEG to point to potential "problems" and to craft the "Task 2" testing program which would investigate that problem.  Id.  "Task 2" consisted of "preliminary boring" and other soil and water sampling to gauge the potential problem and consider whether further study was necessary.  Id.  "Task 3" followed on those sites where preliminary study indicated a need; NYSEG aimed "to collect all information needed to properly perform a risk assessment and to develop conceptual designs for problem resolution."  Id.  "Task 4" completed the "risk assessment."  Id.  "Task 5" consisted of "the development of a conceptual design package which, similar to the risk assessment, has been ongoing throughout the project."  Id.  The memorandum noted that "General Counsel has been incorporated at key points to provide guidance and understanding as to the need for action on NYSEG's part, as well as the legal consequences should no action be taken by NYSEG."  Id.

The memorandum also addressed the role of the DEC in the process.  NYSEG noted that throughout the process of investigating the sties the company had "attempted to keep NYSDEC informed of our investigative activities."  Id.  Plaintiff met with regional and central office staff, engaged in site visits, offered responses to DEC's inquiries, and sent DEC "copies of final reports and work plans."  Id.  NYSEG found this engagement useful because the company had more control over the process.  Id. NYSEG could "choose the order in which sites are investigated, . . .control the contacts and public relations issues . . . and . . . establish a reasonable investigative schedule, thereby cost."  Id.  NYSEG noted that DEC had not been very active in regulating the sites to that point.  Id.  At a meeting on October 15, 1986, however, "central office staff

42

provided an indication of a change in approach on NYSDEC's part."  Id.  Utilities had

begun to take an active role at many of the 200 or so MGP sites in the state, and these

actions had caused DEC's "central office . . . to take a more central role."  Id.  DEC had

decided to "advocat[e] a common approach to each utility, utilizing orders on consent,

the inclusion of all sites on the state registry of inactive hazardous waste sites, the

development of hazard ranking scores for each site, and the incorporation of their

review of the reports, work plans, and at each decision point."  Id.  DEC "has stated that

if NYSEG does not investigate the sites, they will do the investigation and come to

NYSEG as a responsible party for the reimbursement."  Id.  Costs sought by DEC

"would exceed NYSEG investigative costs."  Id.

As explained above, "a claim is an assertion by a third party that in the opinion of

that party the insured may be liable to it for damages within the risks covered by the

policy."  Fairchild Indus., 56 F.3d at 439.  Such notice "must relate to an assertion of

legally cognizable damage, and must be a type of demand that can be defended,

settled and paid by the insurer."  Id. (internal citations omitted).  No "formal proceeding"

is necessary to make a claim.  Id.  Moreover, a claim can exist even without "reason to

believe that there actually is liability."  Id.  "[V]irtually any assertion of an exposure to

liability within the risks covered by the insurance policy is a claim."  Id.  Only when "the

assertion is made in circumstances so unusual that they negate the possibility of a

formal proceeding involving defense costs as well as liability," can assertion of liability

fail to constitute a claim.  Id.  Indeed, a notice of claim provision can "be triggered by an

unreasonable–even sanctionable–assertion of liability."  Id.  Thus, "[a]n assertion of

possible liability, no matter how baseless, is therefore all that is needed to trigger a

43

notice of claim provision." Id.

Here, NYSEG's own documents establish a knowledge that DEC had asserted claims which would implicate the coverage that Plaintiff asserts in this case.[10] NYSEG recognized in 1986 that all of the MGP sites it controlled would likely be the subject of regulatory action that would require the expenditure of funds for investigation and remediation, the subject of the coverage dispute in this case. Moreover, NYSEG knew in 1986 that DEC intended to press claims against the company that would lead to investigations on the property. NYSEG determined that if the company did not do the investigations itself, DEC would undertake them and submit a bill in excess of the costs NYSEG would incur to perform them itself. Since no formal proceedings are necessary to implicate a claim, and NYSEG recognized that DEC would act formally against NYSEG if NYSEG did not act, DEC asserted a claim which NYSEG had an obligation to report to the insurers.

Plaintiff's position is that "[a] 'claim' against NYSEG was first made in 1994 through the consent order entered into with DEC." Plaintiff's Brief in Response to Defendant's Motion, dkt. # 137, at 16. "This was the first regulatory compulsion that NYSEG faced at its MGP sites." Id. Plaintiff's understanding of a "claim" is too narrow here. The Orders on Consent signed between NYSEG and DEC in this case are formal agreements obligating the Plaintiff to perform certain work and undertake certain

_____

[10]Additional information in the record and in the parties' moving papers also supports the notion that DEC was closely involved in supervising the MGP sites during the 1980s and had asserted regulatory authority on different bases, particularly discussion of the establishment of the DEC's Registry. See, e.g., Defendants' Statement and Plaintiff's Response, ¶¶ 30-47.

activities.  In that sense, they are agreements settling a claim against the Plaintiff.

Plaintiff urges the Court to consider such agreements as the events that assert claims.

If the Court were to adopt this perspective, a claim requiring notice would not occur until

after the insured negotiated an agreement to settle that claim.  The illogic of this

position is obvious.  The purpose of notice is to permit the insurer to be involved in

negotiating the claim and, perhaps, to institute a process leading to a more cost-

effective resolution of the matter.  To allow an insured to wait to provide notice of a

claim until after the claim has been settled would undermine the purpose of notice

provisions.  As such, the Court will find that Plaintiff failed to provide notice under the

policies and Defendants are not obligated to provide coverage.

Defendants also argue that Plaintiff failed to meet the occurrence or accident

notice provisions in the policy as well.  They point to a number of facts to support the

their claim that NYSEG had spent considerable time, effort and money to investigate

the five sites in question before providing notice.  As a general matter, the Court notes

that the thousands of pages of documents in the record for this case clearly

demonstrate that NYSEG engaged in a robust program of investigation years before

providing notice of the MGP site claims to the insurers.  These investigations employed

environmental consultants and other experts, and were clearly designed to head off any

regulatory efforts by State and federal agencies.  Indeed, NYSEG supplied the

regulators with records of their investigations throughout the 1980s and early 1990s.

The funds that NYSEG seeks to recover in this case arise in large part from such

investigations.  NYSEG went a long way down the road of such investigations before

notifying the Defendants of occurrences.

Defendants point to a number of facts which support their claim that Plaintiff was well aware of pollution at the five MGP sites in question. Defendants note that Plaintiff notified the EPA of potential hazardous waste activity at all five of the sites here in question on June 9, 1981. Defendants' Statement at ¶ 5. Plaintiff points out that such notification did not admit that the waste was actually hazardous, but in fact argued the opposite. Plaintiff's Response at ¶ 5. Still, Plaintiff admits that an evaluation of the sites was necessary even if the wastes were not hazardous. Defendants' Statement at ¶ 6. NYSEG engaged in soil sampling at 19 former MGP sites by December 3, 1981. Id. at ¶ 7. Such soil samples were designed, at least in part, to determine whether coal tar was in the soil. Defendants' Statement at ¶ 8; Plaintiff's Response at ¶ 8. By 1983, NYSEG began to discuss an internal plan to investigate 17 MGP sites from January 1984 to December 1988. Defendants' Statement at ¶ 11. One evaluator speculated that at worst, all 17 sites would require investigation and remediation. Id. at ¶ 12. This evaluator estimated the cost for such investigations at $4 million. Id. at ¶ 13. An interoffice memorandum, dated February 27, 1984, recommended a five-year plan to investigate the sites, stating that:

> There is an increased concern for potential damage to the environment due to reside at manufactured gas plant sites. This is evidenced by recent news media coverage of former sites in New Jersey. Also the potential exists that New York standards for discharge are being exceeded in the case of our sites. It is reasonable to assume that any long-term investigation plan would result in intervention by some regulatory agency, which could prove more expensive than following our own plan. It is therefore my recommendation that a five-year investigation plan be adopted.

Exh. 25 to Walsh Dec. The memo estimated the cost of the investigation to be $273,400 per site. Id.

A December 20, 1984 work order issued by NYSEG covered 17 MGP sites, specifying the dollar amount to be spent for each site.  See Exh. 33 to Walsh Dec.  The work order for the Cortland-Homer site, for instance, was designed "[t]o evaluate the former Coal Gasification Site to determine if pollution problems exist; define the magnitude of any problems; and to recommend appropriate conceptual remedial actions, if they are required, commensurate with site specific conditions and the nature and magnitude of the problem at the site."  Id.  Tests performed at the Cortland-Homer site had found that "the site has the potential to be discharging contaminants in contravention of NYSDEC regulations.  Federal and state regulations require NYSEG to evaluate and monitor the site."  Id.  NYSEG anticipated the cost of the Cortland-Homer study in 1985 to approximate $120,000.  Id.  NYSEG anticipated spending $110,000 at Ithaca-Court Street that year, $100,000 in Oneonta, and $10,000 at Auburn-Clark Street.  Id.  A report the next year estimated that NYSEG would spend $5 million to "investigate the seventeen coal gasification sites."  See Exh. 35 to Walsh Dec.  Only the Norwich site was not included in this program.  Id.  The parties agree that by September 10, 1986, "NYSEG was actively investigating 13 MGP sites.  Defendants' Statement at ¶ 29.[11]  These studies continued into 1986 and 1987, with the DEC playing an increasing supervisory role.  See Defendants' Statement and Plaintiff's Response at ¶¶ 48-55.  NYSEG interacted with DEC about the status of sites on the Registry, including

---

[11]The source for this statement is somewhat equivocal about the number of sites under "active investigation."  See Exh. 59 to Walsh Dec.  The text of the report, issued on September 10, 1986, states that "[t]he present investigation began in 1985 utilizing two consulting firms to investigate 17 sites over five years.  At the present time 13 are under active investigation."  Id.  Later in the report, however, a table indicates that NYSEG has 15 "Sites with Active Investigation."  Id.

Ithaca-Court Street, Cortland-Homer, Owego and Plattsburgh, during 1986, 1987 and 1988.  Id. at ¶¶ 58-78.

Investigations at the sites continued through 1991, and by early/mid 1991 NYSEG had spent considerable sums at each of the five sites in question.  See Defendants' Statement at ¶ 106.  Plaintiff does not dispute the following expenses for each site:

| | |
|---|---|
| Auburn-Clark Street: | $28,471.11 as of 7/1991 |
| Cortland-Homer: | $489,252 as of 4/91 |
| Ithaca-Cort Street | $497,930.84 as of 5/31/1991 |
| Norwich | $30,000 as of 6/91 |
| Oneonta | $569,298 as of 5/31/91 |

Id.; Plaintiff's Response at ¶ 106.

The Court finds that Plaintiff's involvement in investigating these sites, particularly when combined with Plaintiff's interactions with DEC about them, demonstrates clearly that Plaintiff knew for years before providing notice that each of the sites in question contained a serious potential for a damage claim from MGP operations.  Moreover, Plaintiff had engaged in investigations which demonstrated an event stronger likelihood of the potential for a claim.  Giving the insurers notice of those potential claims in the 1980s would have meet the purpose of the notice provisions contained in the policies, giving the insurers the opportunity to shape interactions with regulators, make decisions about how to deal with the pollution at the sites, and to limit the damage to the property caused by the pollution. Instead, Plaintiff attempted to deal with the pollution on its own and then present the insurer with a bill, years later.

This case is strikingly similar to Travelers Indem. Co. v. Orange and Rockland Utilities, Inc., where the New York Appellate Division found that a utility failed to give its

excess insurer timely notice of pollution claims.  73 A.D.3d 576 (1st Dept. 2010).  The

Court noted that the utility's:

> ongoing contacts with environmental regulators about the . . . site dated
> back to 1981, and there was even a site inspection by the Environmental
> Protection Agency in 1985, yet defendant never provided any notice to its
> insurer of these contacts or the questions they raised until 1995.
> Defendant's argument that it never had actual notice of any pollution was
> insufficient.  The many reports, including internal reports of a likelihood of
> contamination at the subject site, as well as inquiries from regulators,
> placed it on notice.

Id.

The Court of Appeals in 2015 reached the same conclusion in a case involving

different sites but the same parties, finding that the utility's:

> argument that it never had actual notice of any pollution was insufficient.
> The record abounds with documents demonstrating that pollution likely
> existed at each of the sites considered herein.  These documents, along
> with repeated interactions with both state and federal regulators, were
> sufficient to place defendant on notice.  Moreover, defendant's willful
> failure to investigate, i.e., its apparent strategy of waiting to be directed by
> the appropriate regulatory agencies to investigate the sites and remediate
> pollution, despite the overwhelming evidence of potential contamination,
> negates its contention of a lack of awareness of the pollution.

Travelers Indem. Co. v. Orage and Rockland Utilities, Inc., 124 A.D.3d 436, 436, 1

N.Y.S.3d 56, 57 (2015).  Like those cases, the Plaintiff here acted in a fashion that

demonstrated knowledge of the potential of a claim years before actually providing

notice to the insurer.  While the Plaintiff contends that its actions represented a

laudatory attempt to take action when faced with pollution, the question here is when a

duty to provide notice attached, not whether the Plaintiff acted as a good corporate

citizen.  That duty attached years before Plaintiff provided notice in 1991, and Plaintiff's

notice was untimely.

Plaintiff's argument that the notice requirement in the policies would not be

triggered unless NYSEG had knowledge that the company's damages from any one policy period would exceed $20,000 is equally unpersuasive. First, the argument is contradictory. Plaintiff contends the policies would not be implicated unless the aggregate of the $20,000 self-insured retention for each year that the policies were in place were reached. As such, Plaintiff insists, damages would have to reach more than $1.8 million for notice to be required. See Plaintiff's Brief in Reply/Response, dkt. # 137 at 26. Despite this argument, Plaintiff seeks damages from sites where NYSEG spent less than $1.8 million in total to investigate and remediate damages. Second, courts applying New York law have rejected the notion that notice is not triggered until an insured knows of damage in each particular policy period: "[a]ll that is required is the possibility or potential of a claim." Household Intern., Inc. v. Liberty Mut. Ins. Co., 749 N.E.2d 1, 11 (Ill. App. Ct. 5th Div. 2001) (applying New York law).

Plaintiff also fails to provide any evidence that its decision to delay notice was an attempt to ascertain whether the excess policies would be implicated. In Long Island Lighting Co. v. Allianz Underwriters Ins. Co., 24 A.D.3d 172, 172 (1st Dept. 2005), the court rejected plaintiff's attempt to claim that its notice to excess insurers regarding environmental cleanup claims was timely because "there was a reasonably possibility that the subject policies, both excess, would not be reached by the" underlying claim, since "plaintiff offers no evidence that the timing of its notice was the result of a deliberate determination to that effect, and not, as the record suggests, the belief that it was not responsible for the . . . cleanup costs." Id. Nothing in the record indicates that NYSEG's failure to provide notice grew out of a reasonable assessment that damages would not reach the excess policies.

50

As such, the Court finds that Plaintiff failed to provide timely notice as required by the policies for each of the sites involved.  Because notice was a condition precedent for coverage under the policies in question and no reasonable juror could find for the Plaintiff on that issue, the Court will grant the Defendants' motion for summary judgment and dismiss the case.[12]

## IV.    CONCLUSION

For the reasons stated above, the Court will GRANT Defendants' motion for summary judgment, dkt. # 126.  Because the Court finds that no reasonable trier of fact could find for the Plaintiff on any cause of action against the Defendants, the Court will DENY the Plaintiff's motion for summary judgment on the issue of timely notice, dkt. # 119, and DENY the Plaintiff's motion for summary judgment on the accident/occurrence issue, dkt. # 155.  Defendant OneBeacon America's second motion for summary

---

[12]As an alternate ground for summary judgment, the Defendant points to the statute of limitations to argue that Plaintiff's Complaint, filed in 2013, was brought outside the statute of limitations.  "The New York six-year statute of limitations begins to run when the contract is breached."  Combs v. International Ins. Co., 163 F.Supp.2d 686, 695 (E.D. Ky. 2001).  "A breach occurs when the insurer denies liability under the contract."  Id.  Accrual also occurs in New York contract cases when the defendant "fail[s] to perform their obligations under the contract," after a demand.  Matter of Carranza v. Prinz, 240 A.D.2d 405, 405, 658 N.Y.S.2d 1011, 1011 (2d Dept. 1997).  Moreover, "the plaintiff will not be permitted to prolong the statute of limitations simply by refusing to make a demand."  State v. City of Binghamton, 72 A.D.2d 870, 871, 421 N.Y.S.2d 950, 952 (3d Dept. 1979).  The Defendants' position is that the Plaintiff's claims accrued when the Defendants disclaimed coverage, which occurred well more than 6 years before the Plaintiff filed the cause of action.  As explained above, Century Indemnity clearly disclaimed on notice grounds on the policies in question in the early 1990s, and would likely prevail before a jury on statute of limitations grounds.  OneBeacon's disclaimer, and thus denial of coverage, is less clear but of no matter as Plaintiff very clearly failed to provide the notice the parties agree the policies required.

judgment, dkt. # 158, is DENIED as moot.[13]  Plaintiff's letter motion to file the Elkind

Declaration, dkt. # 141, which was filed, is DENIED as moot.  The case is hereby

DISMISSED.


Dated:March 31, 2017



Thomas J. McAvoy
Senior, U.S. District Judge

_____

[13]Both of those motions seek judgments from the Court on coverage issues.
Since the Court has determined that coverage is unavailable under the policies
because Plaintiff breached the notice issue, the Court will decline to issue any sort of
declaratory judgment about those policies as a waste of the Court's resources.